## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| JOY DITTBERNER ON BEHALF OF HERSELF and ALL OTHERS SIMILARLY SITUATED, | ) ) ) **CASE NO.** |
| Plaintiffs, | ) ) **CLASS ACTION COMPLAINT FOR** |
| vs. | ) **VIOLATION OF THE FEDERAL** ) **SECURITIES LAWS** |
| LIFE PARTNERS HOLDINGS INC., DAVID M. MARTIN, BRIAN PARDO, R. SCOTT PEDEN, and NINA PIPER, | ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) |

## INTRODUCTION

Plaintiff, Joy Dittberner, brings this federal class action on behalf of the purchasers of Life Partners Holdings, Inc. ("LPHI" or "the Company") securities, including common stock, ("the Class") between May 29, 2007, and January 20, 2011, inclusive, (the "Class Period") seeking to pursue remedies available under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, during the Class Period, the Defendants with knowledge and/or reckless disregard issued a number of materially false and misleading statements and omissions resulting in damage to Plaintiff and the Class.

## BACKGROUND

1.      LPHI is one of the few publicly traded companies, through its primary operating subsidiary, Life Partners, Inc., operating in the secondary market for life insurance or as it is generally known "life settlements." A life settlement transaction involves the sale by the policyholder of the life insurance to another party in exchange for an immediate cash payment. The purchaser buys the policy at a discount and receives the death benefit once the original

policyholder passes away.  As a financial services company, LPHI, earns fees from providing life settlement purchasing agent services to both individual and institutional clients.  In performing these services, LPHI identifies, evaluates and purchases policies for their clients based on the client's criteria.  LPHI derives its operating revenues from the fees received for facilitating such life settlement transactions.

2.      *The Wall Street Journal* published an article on December 21, 2010, which questioned the Company's life expectancy estimates, life expectancy data and its business practices.  The article reported on an in-depth analysis and investigation into how LPHI sold life settlement policies to investors.  The investigation revealed that the Company earned huge fees from its life settlements transactions "while often significantly underestimating the life expectancies of people whose policies its customers invest in."

3.      The Company's Chief Executive Officer Brian Pardo responded to *The Wall Street Journal* article in a letter addressed to shareholders that characterized the report as "a misleading depiction of some of our business practices and appeared to be based on anecdotal or incomplete information and the self-serving criticisms of some of our competitors."

4.      Subsequently, on January 20, 2011, *The Wall Street Journal* reported that the SEC had begun to investigate LPHI, which was confirmed by the Company.  The SEC examination will focus on the Company's methods of calculating the life expectancy estimates and the data utilized in such computations.

5.      Following this news, the Company's stock fell $2.58 per share, or over 17%, on unusually heavy trading volume to close the trading day at $12.46 per share.  LPHI's stock continued its decline in the days following these revelations.

6.     Throughout the Class Period, Defendants misrepresented or omitted to report the following the material adverse information concerning the Company's financial operations:

a.     That the Company utilized unrealistic life expectancy data in performing its evaluation of life insurance policies resulting in inaccurate and misleading life expectancy reports, which were then used to sell the policies to investors;

b.     That the Company concealed from investors information regarding the rate at which the underlying policyholder had exceeded the life expectancy estimates produced by the Company and in turn, did not allow the investors to review or assess such information;

c.     That the Company was able to accumulate a larger amount of fees from investors by misrepresenting the life expectancy data of the underlying policyholder;

d.     That the Company significantly increased its revenues through use of such improper business practices;

e.     That, at all relevant times, the Company's financial statements and reports were materially false and misleading as result of such practices;

f.     That the result of such improper business practices being exposed would lead to an SEC investigation of the Company;

g.     That the Company's quality, internal and financial controls were inadequate; and

h.     That as a result, all statements regarding the Company's financial well-being, business prospects and future growth potential had no evidentiary support.

7.      Therefore, as a result of the Defendants' wrongful conduct causing the stock price to collapse, the Plaintiff and the Class suffered damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and 78t(a) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act as the Company maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

12.     Plaintiff Joy Dittberner acquired LPHI common stock during the Class Period, and as a result of the Defendants material misstatements and omissions, suffered injury upon the publication of the corrective disclosures and removal of the artificial inflation from the stock price. Plaintiff's certification is attached hereto.

13.     Defendant LPHI is incorporated in Texas and maintains its executive offices at 204 Woodhew Drive, Waco, Texas 76712, in this judicial district. LPHI is a specialty financial services company and the parent company of Life Partners, Inc.

14.     Defendant Brian Pardo, at all relevant times, was and is the President and CEO of the Company and the CEO of Life Partners, Inc., the Company's primary operating subsidiary. Defendant Pardo has served as CEO of Life Partners, Inc., since its incorporation in 1991 and is considered one of the pioneers of the life settlement industry.  He is considered the beneficial owner of approximately 50% of the Company's common stock, largely as the result of exercising voting power by proxy over shares held by The Pardo Family Trust.

15.     Defendant Nina Piper ("Piper") was the Company's Chief Financial Officer ("CFO") until 2007.

16.     Defendant David M. Martin ("Martin") is the Company's CFO.  Defendant Martin was hired in February 2008 to serve in such capacity.

17.     Defendant R. Scott Peden ("Peden") was, at all relevant times, and is the Company's General Counsel, Secretary of the Company and President.  He has served in each respective capacity since 2000.

18.     Defendants Pardo, Piper, Martin and Peden are referred to collectively as the "Individual Defendants"

19.     The Individual Defendants, by reason of their direct and substantial management positions and responsibilities during the time relevant to this Complaint, were "controlling persons" of LPHI within the meaning of Section 20 of the Exchange Act and had the power and influence to control LPHI and exercised such control to cause the Company to engage in the violations and improper practices complained of herein.  The Individual Defendants, because of their positions as officers of LPHI had access to adverse non-public information about the Company's financial condition and future prospects.

20.     The statements made by Defendants as outlined below were materially false and misleading when made.  Defendants had no reasonable or adequate basis to justify or support their revenues guidance.  The true financial and operating condition of the Company, which was known or recklessly disregarded by the Defendants, remained concealed from the investing public.  Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

22.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, LPHI had more than 15,024,354 million shares of stock outstanding which were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record  owners  and  other  members  of  the  Class  may  be  identified  from  records maintained by LPHI, its underwriters or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

27.     The Class Period commenced on May 29, 2007, when the Company filed its Annual Report with the SEC on Form 10-KSB for fiscal year 2007, ended February 28, 2007. The Company reported revenues of $29.8 million, net income of $3.6 million and earnings per share of $0.36 for the 2007 fiscal year.  The Form 10-KSB, which was certified pursuant to Sarbanes-Oxley by Defendants Pardo, Piper and Peden, stated, in pertinent part:

We are a financial services company, providing purchasing services for life settlements to our client base. We do this by matching life settlors with purchasers. We facilitate these transactions by identifying, examining, and purchasing the policies as agent for the purchasers. *In order to meet market demand and maximize our value to our clients, we have made significant investment in proprietary software and processes that enable us to facilitate a higher volume of transactions while maintaining our quality controls.* Since our inception, we have facilitated over 50,000 purchaser transactions associated with the purchase of over 5,600 policies. *We believe our experience, infrastructure and intellectual capital gives us a unique market position and will enable us to maintain sustainable growth within the life settlement market.*

\*                    \*                    \*

Unlike some of our competitors, which have more restrictive purchasing parameters or a single provider of investment capital, we have developed markets for all types of life expectancies in order to accommodate the investment goals of our clients as well as the individual circumstances of the policies presented to us. We believe this diversified capital business model makes us more competitive in the market and provides us with greater flexibility. We also believe that this model provides a stronger platform for our sustainable growth as a company. Markets are segmented by length of life expectancy and policy face value. The amount of competition in these markets varies according to the demand for such policies.

\*                    \*                    \*

*Revenues - Revenues increased by $9,711,670, or 48% from $20,083,653 in fiscal 2006 to $29,795,323 in fiscal 2007.* This increase was due primarily to a 73% increase in our total business volume as measured by the face value of all policy settlements transacted through us and a 75% increase in the average revenue per settlement from $77,543 in fiscal 2006 to $135,433 in fiscal 2007. *The number of settlements we transacted this year decreased by 18% from last year continuing a trend toward fewer number of transactions, but with larger face amounts.*

*[Emphasis Added]*

28.     These statements were false and misleading because the proprietary software and quality controls being utilized by the Company were entirely inadequate, such is evident from

the failure of these systems to correct the inaccuracies in the life expectancy calculations. Further, Defendants Pardo, Piper and Peden had knowledge of or recklessly disregarded such inadequacies and the inaccurate information being produced and affecting the Company's underlying financial results.

29.     Moreover, the Form 10-KSB, pursuant to Section 13a-14 of the Exchange Act, included the certifications of Defendants Pardo, Piper and Peden, which were to attest to the completeness and truthfulness of all the Company's financial reports.  Defendants Pardo, Piper and Peden either with knowledge or in reckless disregard misrepresented the accuracy and completeness of the Company's financial reports, by failing to correct the wrongful disclosures.

30.     On May 15, 2008, LPHI filed its 2008 fiscal annual report with the SEC on Form 10-K.  The Form 10-K reported revenues of $72.6 million, net income of $18.7 million and earnings per share of $1.56 for the 2008 fiscal year.  The Form 10-K, which was certified pursuant to Sarbanes-Oxley by Defendants Pardo, Martin and Peden, stated, in pertinent part:

> We are a financial services company, providing purchasing services for life settlements to our client base. We do this by matching life settlors with purchasers. We facilitate these transactions by identifying, examining, and purchasing the policies as agent for the purchasers. *In order to meet market demand and maximize our value to our clients, we have made significant investment in proprietary software and processes that enable us to facilitate a higher volume of transactions while maintaining our quality controls.* Since our inception, we have facilitated over 50,000 purchaser transactions involving over 5,700 policies totaling over $1 billion in face value. *We believe our experience, infrastructure and intellectual capital gives us a unique market position and will enable us to maintain sustainable growth within the life settlement market.*
>
> We match life settlors with purchasers. We act as agent for settlement purchasers, for whom we identify and qualify policies. We locate potential life settlors through a network of brokers, insurance, financial and estate planning professionals, through personal referrals and through Internet and print media advertising.

\*                           \*                           \*

Unlike some of our competitors, which may have more restrictive purchasing parameters or a single provider of investment capital, we have developed markets for all types of life expectancies in order to accommodate the investment goals of our clients as well as the individual circumstances of the policies presented to us. We believe this diversified capital business model makes us more competitive in the market and provides us with greater flexibility. We also believe that this model provides a stronger platform for our sustainable growth as a company. Markets are segmented by length of life expectancy and policy face value. The amount of competition in these markets varies according to the demand for such policies.

\*                           \*                           \*

Revenues - *Revenues increased by $42,813,932, or 144% from $29,795,323 in fiscal 2007 to $72,609,255 in fiscal 2008.* This increase was due primarily to a 174% increase in our total business volume as measured by the face value of all policy settlements transacted through us and a 164% increase in the average revenue per settlement from $135,433 in fiscal 2007 to $356,891 in fiscal 2008. *The number of settlements we transacted in fiscal 2008 decreased by 9% from last year continuing a trend toward fewer transactions, but with larger face amounts. Revenues in fiscal 2007 increased by $9,711,670 or 48% from $20,083,653 in fiscal 2006 to $29,795,323 in fiscal 2007. This increase was also a result of the increase in policy face amounts and in average revenue per settlement.*

*[Emphasis Added]*

31.     These statements were false and misleading because the proprietary software and quality controls being utilized by the Company were entirely inadequate, such is evident from the failure of these systems to correct the inaccuracies in the life expectancy calculations. Defendants Pardo, Martin and Peden had knowledge of or recklessly disregarded such inadequacies and the inaccurate information being produced and affecting the Company's underlying financial results.  Further, Defendants Pardo, Martin and Peden had knowledge of or

recklessly disregarded the fact that the Company was inflating the value of the policies because of inaccurate life expectancy data, resulting in unsustainable business practices.

32.    Moreover, the Form 10-K, pursuant to Section 13a-14 of the Exchange Act, included the certifications of Defendants Pardo, Martin and Peden, which were to attest to the completeness and truthfulness of all the Company's financial reports.  Defendants Pardo, Piper and Peden either with knowledge or in reckless disregard misrepresented the accuracy and completeness of the Company's financial reports, by failing to correct the wrongful disclosures.

33.    On October 17, 2008, LPHI hosted an earnings conference call with investors and financial analysts.  During this call, Defendant Pardo stated, in pertinent part:

> And I think that one of the interesting or most interesting features of this is that, as most of you know if not all of you know, we've been constantly telling our clients, our now 21,000 investor clients, as well as all of our shareholders, that Life Partners and the product, life settlements, are immune from any potential downturn in the market and from any reason that we can think of.  And that would be the outturn in the markets generally, currency problems, geopolitical problems, price of oil -- you name it and all of those markets may be affected or some may be affected.

> But in all cases none of them affect life settlements. So we see the [footing] for life settlements as being based or this aspect of life settlements to be the basis of our clients for making the decisions to purchase life settlements and also to own stock. Obviously over the last several weeks, we have had this tremendous upheaval in the market.

> So we -- I think that we said that we didn't expect that we were going to have such a demonstrative way of going about proving what we've been saying all along. And that is actually what we said has come about and we didn't realize that it had. But none of our clients -- and roughly 77,000 transactions that we've done for roughly 21,000 clients -- not a single client's investment has been altered in any way, lost a single penny, or have been affected adversely in any way whatsoever.

> So life settlements have lived up to what we said and what we expect them to do [in that] they truly are immune. ***Most people that have looked at us from a point of view of just analyzing the***

> ***Company, analyzing the stock or perhaps taking an interest in buying the stock, or taking an interest in being a client in this sense of investing in the policies have taken a pretty close look at Life Partners. And I've seen this coming.***
>
> ***So I expect that the results that we've seen happen just here within the last couple of weeks -- and so that has increased the amount and number of people that are interested in and affect our investing in life settlements with the realization that it really will protect their funds, at least that aspect of their portfolios.***

\*                     \*                     \*

> BRIAN PARDO: Obviously, the growth in lifestyle and the market has a synergistic affect on our stock. And we think that one of those reasons is that investors can become involved with Life Partners in several -- well, a few ways. They can be a buyer of our product and that is a client then of the companies and means life settlements is what they were intended for and that is, a port in a storm -- literally, a place to invest money that is reliable. And as we've just said, immune from any of the other industries that are affected by the market conditions.
>
> And of course to the very same reasons they can also take advantage of buying our stock. I am, of course, a big believer in our stock. I own enough of it. ***But I think besides being funded in a very, very solid company with a very solid future, strong balance sheet for our size company and a strong earnings history of revenues and earnings, that buying our stock is a -- would be a natural conclusion as well as buying our product.***
>
> *[Emphasis Added]*

34.     Defendant Prado made these statements with knowledge of or in reckless disregard of the fact that the Company's stock price, earnings history, revenues and earnings were all inflated by the Company's improper business practice of using inaccurate life expectancy data to calculate the value of the underlying policies.

35.     Also on the October 17, 2008, earnings conference call, the Defendants took questions from investors and analysts.  The transcript, in pertinent part, stated:

> ANALYST: I just had another sort of accounting question. I was looking at your premium advances for the quarter which were up a

bit, and I read that in the Q that said that the settlements -- most of which were made before 1990 -- allegedly lacked sufficient disclosure about the purchasers' obligation to pay premiums in order to maintain the acquired policy.

So these are older policies that you guys are having to make the advances on? And I was just curious. If a policy has been outstanding for more than 10 years, what kind of return does that suggest to the investor?

SCOTT PEDEN: Obviously, now, the kinds of policies we are talking about in that time frame are completely different from the kind of policies that we are doing right now. Life settlements typically are on an individual who -- as Mr. Pardo said earlier -- is between 78 and 80 to years old. The average face value right now is about $3.8 million or so.

BRIAN PARDO: Yes. But it would still be -- excuse me for interrupting, Scott. It would still be -- the way those are underwritten -- would be 4 or 5% return. And so that's about what we're looking at, and we will -- with regard to that, you know, as we carry it on our balance sheet under other items, we don't actually put it on our balance sheet.

ANALYST: Right. It's fully reserved against. I see that.

(multiple speakers)

BRIAN PARDO: That's right but we do get that money back. And so it's kind of like Christmas, when we get it paid back. It is merely an issue that had to do with the policies that were -- did have longer life expectancies.

And we thought like there was -- a disclosure was adequate, but the Attorney General felt like it wasn't. And so rather than argue about it because we are going to get the money back anyway, we said, "Okay, we will advance it." And it's paid and we will get the money paid back. Basically it's not really at this point a material issue anymore for the Company.

SCOTT PEDEN: So because of the discount on there, certainly the returns are still positive even with (multiple speakers). Very positive, yes.

ANALYST: You are saying 4 to 5%. What is a kind of -- what kind of return are you suggesting or indicating to potential investors these days? What should they expect?

*BRIAN PARDO: We like to tell our clients to be looking for a low double-digit return.*

*ANALYST: Okay. 11, 12%? That kind of return?*

*BRIAN PARDO: Yes. And I think if they are expecting that, they will not be disappointed.*

SCOTT PEDEN: The other aspect of it is it is completely not correlated and especially in today's market. That's almost more valuable than the return.

ANALYST: Right.

*          *          *

UNIDENTIFIED SPEAKER: But the question I asked earlier, I just wanted to get back to that. *Obviously you didn't agreed with I guess it was National Financial statement about the lengthening of the life expectancies.* I know I looked in the K.

It says you used both in-house and outside experts. I was just curious. The outside experts because I think there's only a handful, which ones in particular if you could disclose that you might actually use and what percentage that is?

BRIAN PARDO: *No, we can't get into that level of detail with how we do business because it's proprietary. But all we're saying if it was misunderstood, possibly, is that the changes that were implemented by 21st Services had no effect at all on anything involving LPHI.*

UNIDENTIFIED SPEAKER: *Okay. So it is not affecting business as usual. Before and after, it seems to be the same then?*

BRIAN PARDO: *That's correct.*

(Emphasis added)

36.     Defendants Pardo and Peden made these statements with knowledge or in reckless disregard of the fact that based upon the inflated values of the life settlements due to inaccurate life expectancy data, an investor would rarely receive such a return on its investment.  Further, Defendants Pardo and Peden knew or recklessly disregarded the effect that failing to adjust for

14

longer life expectancy could or would have on the Company and the harm it would cause investors.

37.       On January 13, 2009, the Defendants hosted a conference call with investors and financial analysts.  During the course of the conference call, Defendants Pardo and Peden stated, in pertinent part:

> BRIAN PARDO: So our services and what we do are becoming very apparent to those people and they are flocking, literally, to us. And the same time investors are flocking to this because they see that this is truly -- is true diversification. *We have never recommended that anybody puts all of their money in any one thing, but we are certainly saying that you should have a very strong component of your investment portfolio in life settlements.*
>
> *Done properly and done the way that Life Partners does them and with the history that we have, obviously, we think that they ought to be doing it with us. And currently a lot of them are.*
>
> \*                            \*                            \*
>
> SCOTT PEDEN: Of course, LPHI is the only publicly traded life settlement provider, so it seems that *investors could benefit from the enormous interest that you can talk about in life settlements by becoming one of our clients or by buying our stock.* They could do it either way.
>
> BRIAN PARDO: Yes, and actually I think we are seeing that. We are seeing a lot of people who are selling us their policies and then once they actually see that transaction go full cycle I think they are good candidates. We have noticed where -- their named accounts at least, anyway we are being told -- but they are also turning around and becoming shareholders as well. So it's nice to see them have that kind of confidence in the Company.
>
> But of course firsthand they are seeing what we are doing and the good that it's doing. *So it's a great opportunity for us and for our marketing people to be able to be out there, particularly in this climate, this economic climate and being something that is genuinely good for the people that we are helping by buying their policies. Also, the elevated level of returns that we are delivering to our investor clients.*
>
> \*                            \*                            \*

BRIAN PARDO: So first of all, when somebody decides they are going to invest money with us. In other words, to buy a policy. They do not write a check to Life Partners. They write a check to an independent escrow agent and an account is set up there. We act as an instruction-driven agent to pick out. We are kind of the Coldwell Banker of the insurance world.

*And so our job is to find policies, source policies that are qualified, underwrite them, make sure that they meet the underwriting and the investment criteria that the clients are looking for and that we know they are looking for to produce the kinds of returns that we are wanting, double-digit returns, and in a reasonable timeframe -- four, five, six years.* And so we don't collect a dime of money. It stays in the escrow account until a policy or a piece of a policy has been selected and chosen by the client and the client authorizes us through a written document to make that buy on their behalf. Then it's actually the escrow company that ends up taking the money, paying the owner of the policy, paying the fees -- now that is when we get paid only on the event of the occurrence of the transaction.

We don't get paid beforehand and we don't get paid afterwards. We don't get paid success fees. We don't get paid percentages of -- if we run over certain boundaries. We don't get paid anything except what we are paid to do the transaction.

\*    \*    \*

BRIAN PARDO: *We are very transparent. We went public to become transparent.* Obviously, we didn't anticipate Enron and therefore we didn't anticipate Sarbanes-Oxley and we didn't anticipate this ridiculous turn of events in mortgages. I mean who would have thought that you could buy a house without a job, without credit, without money. But somehow they have managed to work that out so -- anyway we didn't anticipate any of that.

*But what we did anticipate was that this had to be an absolutely sound investment with no chance of funds going south because of some event like this or extraordinary as it might be, some risk that we didn't anticipate or alternatively we get our hands into somebody's pocket.* That we did make sure that was not going to happen. So our investors see that.

\*    \*    \*

ANALYST: You made some comments about the policy sellers and how this credit crisis has accelerated their need for money.

16

Could you also make some comments about the buyers and if this credit crisis has had any influence on the buyers? And also about the pricing of policies, has this credit crisis had any influence as to the seller's reduction of prices or the buyer's elevation of prices, or anything that you can really put forth to see what has changed since we are in a different environment today than we were six months ago or a year ago?

BRIAN PARDO: ... Once they had a chance to sit down and sort things out they realized of course that you are not one to make any money of any magnitude with the bank or in treasuries or anything like that. *So we have seen a larger number of buyers coming to us because of the safety of the transaction and also buyers who were already in the transaction coming in with more.*

With regard to the sellers, it is true that there is a little more margin and the returns are somewhat better, as you might expect, because there is just more supply. But we are loathe to take a lot of advantage of that because we don't want to end up on the Wall Street Journal front page saying that we are taking advantage of a bunch of elderly citizens on our pricing. And going back and looking at what we were buying policies for last year and saying they are now nicking them 10% or something like that just because they can.

*So while there has been some improvement in margins, we have pretty much kept the bar about the same because the returns have been very, very good.* Nobody is complaining about that strategy and I think that as we explain that to our clients, they basically agree with that.

(Emphasis added)

38.     Defendants Pardo and Peden made several material misrepresentations and omissions in this earnings conference call. Defendants Pardo and Peden knowingly or in reckless disregard made statements concerning; the Company's history of strong stable returns without mentioning the returns were inflated due to inaccurate life expectancy data, the level of returns that investors can receive from such life settlements, the transparency of the Company and its representations, and the soundness of the investment and limited risk involved.

39.　　On May 29, 2009, LPHI issued a press release titled "Life Partners Reports Record Earnings." The press release stated, in pertinent part:

> On May 29, 2009, the Company issued a press release entitled "Life Partners Reports Record Earnings." Therein, the Company stated, in relevant part:
>
> Life Partners Holdings, Inc. (Nasdaq GS: LPHI), parent company of Life Partners, Inc.*, today reported net earnings of $27.2 million or $1.83 per split-adjusted share for the fiscal year ended February 28, 2009 compared to $18.8 million or $1.25 per split-adjusted share for a 46% increase over the prior year. Life Partners also reported revenues of $103.6 million for the year, a 43% increase over the $72.6 million reported for last year.* All figures are adjusted for the 5-for-4 forward stock split which occurred on February 16, 2009.
>
> For the quarter ended February 28, 2009, the company reported earnings of $7.0 million on revenues of $26.3 million or $.48 per split-adjusted share compared with $4.5 million on revenues of $18.1 million or $.30 per split-adjusted share for the same period last year.
>
> 　　　　*　　　　　　　*　　　　　　　*
>
> Brian Pardo, Chief Executive Officer of Life Partners Holdings, Inc., said, *"We are extremely pleased with our results for this year. At a time when many companies are facing severe downturns in earnings, we are proudly growing our business and continuing to deliver value to our shareholders and our clients.* The demand for life settlements and our services continues to grow and our success is proven by these financial results."
>
> [Emphasis Added]

40.　　These statements were materially misleading because of misrepresentations and omissions of material facts concerning the inflation of the Company's revenues and financial results due to inaccurate life expectancy data and subsequent inflation in the value of the life settlements. Furthermore, statements regarding the growth of the business were misleading as they failed to recognize that the Company's business practices were unsustainable.

41.     Also on May 29, 2009, the Company filed its 2009 fiscal year report with the SEC on Form 10-K and reaffirmed the results released in the press release from earlier in the day. Additionally, the Form 10-K was accompanied by the Sarbanes-Oxley certifications of Defendants Pardo, Martin and Peden.  The LPHI Form 10-K, stated, in pertinent part:

> We are a specialty financial services company, providing purchasing services for life settlements to our client base. We facilitate these transactions by identifying, examining, and purchasing the policies as agent for the purchasers. *To meet market demand and maximize our value to our clients, we have made significant investment in proprietary software and processes that enable us to facilitate a higher volume of transactions while maintaining our quality controls.* Since our inception, we have facilitated over 84,000 purchaser transactions involving over 6,000 policies totaling over $1.8 billion in face value. We believe our experience, infrastructure and intellectual capital gives us a unique market position and will enable us to maintain sustainable growth within the life settlement market.

> We act as a purchasing agent for life settlement purchasers. In performing these services, we identify, qualify and purchase policies on behalf of our clients which match their buying parameters and return expectations. Because we must work within these parameters, we must make offers which are competitive from the seller's point of view, but still fit within the buying parameters of our clients. *This success-based compensation formula insures that we bring value to both parties to the transaction and that both buyer and seller are satisfied.* We locate potential policy owners through a network of brokers, insurance, financial and estate planning professionals, through personal referrals and through Internet and print media advertising.

> \*                    \*                    \*

> *Revenues - Revenues increased by $31,005,185, or 43% from $72,609,255 in fiscal 2008 to $103,614,440 in fiscal 2009. This increase was due primarily to a 67% increase in our total business volume as measured by the face value of all policy settlements transacted through us and a 48% increase in the average revenue per settlement from $356,891 in fiscal 2008 to $528,645 in fiscal 2009. The number of settlements we transacted in fiscal 2009 decreased by 2% from last year continuing a trend toward fewer transactions, but with larger face amounts. Revenues in fiscal 2008 increased by $42,813,932 or 144% from*

*$29,795,323 in fiscal 2007 to $72,609,255. This increase was also a result of the increase in policy face amounts and in average revenue per settlement.*

During the periods, demand for our services remained strong and the number of policies presented to us and meeting our purchasing qualifications remained constant. *Growth in demand was especially strong for policies with higher face values among both institutional and retail clients, and we anticipate this demand trend to continue for the foreseeable future. ... With our multi-client business model, we believe we can serve the demand for all our current and future clients.* We believe this business model will permit us to achieve sustainable growth for the foreseeable future, without the risks associated with a single or limited number of clients.

We believe the increasing demand for our services results from several factors, one of which is an investment trend toward diversifying investment portfolios and avoiding economically sensitive investments. Returns on life settlements are linked to the lives of the insureds. As such, settlements function independently from, and are not correlated to, traditional equity and debt markets and commodity investments. We benefit from the investment community searching for returns higher than what is currently available in the traditional marketplace.

[Emphasis Added]

42.     These statements were false and misleading because the proprietary software and quality controls being utilized by the Company were entirely inadequate, such is evident from the failure of these systems to correct the inaccuracies in the life expectancy calculations. Defendants Pardo, Martin and Peden had knowledge of or recklessly disregarded such inadequacies and the inaccurate information being produced and affecting the Company's underlying financial results. Further, Defendants Pardo, Martin and Peden had knowledge of or recklessly disregarded the fact that the Company was inflating the value of the life settlements policies of because inaccurate life expectancy data, resulting in unsustainable business practices.

43.     Further, the May 29, 2009, Form 10-K went on to discuss the Company's own investments in life settlements. The Form 10-K stated in pertinent part:

*From time to time, we purchase interests in policies to hold for investment purposes.* ... The balance of Investment in Life Insurance Policies is routinely tested for impairment and valued accordingly. Impairment for the year ended February 28, 2009 was $151,810. There was no impairment recorded for the year ended February 29, 2008. *The balance of Investment in Policies increased significantly during fiscal 2009, the majority of which resulted from a settlement of a case with the State of Colorado. The Securities Commissioner for the State of Colorado filed an action alleging violations of the Colorado Securities Act in connection with certain life settlements transacted through our subsidiary, Life Partners, Inc. This action was settled with the agreement that LPI would offer to purchase the interests of certain Colorado clients.* Under the terms of the settlement, Life Partners, Inc. agreed to offer to purchase the life settlements from the Colorado investors alleged in the complaint, and all purchasers that accepted the purchase offer received additional compensation for the purchase equal to statutory interest. As of February 28, 2009, we had purchased interests in 260 policies and paid $6,318,665, including $1,286,833 of statutory interest related to the Colorado settlement. After February 28, 2009, we purchased interests in an additional 264 policies related to the Colorado settlement and paid $6,441,625, including $1,413,908 of statutory interest. LPI has completed this purchase offer. The total amount paid to the purchasers who accepted this offer totaled interests in 524 policies and $12,760,290, of which $2,700,741 represented the payment of statutory interest.

*[Emphasis Added]*

44.     These statements regarding the Company's own investment in life settlements omits several material facts.  The Defendants failed to disclose the inadequacy of the internal or quality controls that led to the action by the Colorado Securities Commissioner.  Additionally, the Defendants did not disclose that the Company would not make any adjustments to the information available to investors regarding the methodology used to compute the relevant life expectancy data.

45.     Moreover, the Form 10-K, pursuant to Section 13a-14 of the Exchange Act, included the certifications of Defendants Pardo, Martin and Peden, which were to attest to the completeness and truthfulness of all the Company's financial reports.  Defendants Pardo, Piper

and Peden either with knowledge or in reckless disregard misrepresented the accuracy and completeness of the Company's financial reports, by failing to correct the wrongful disclosures.

46.    On July 14, 2009, LPHI hosted an earnings conference call with investors and financial analysts. During the course of the conference call, Defendants Pardo and Peden stated, in pertinent part:

> ANALYST: Just kind of given what you've talked about and the -- sort of the collapse in the credit markets or in the banking sector, and given all the policies that are, I guess, newly available, what would you say has happened to the sort of expected [internal rate of return ("IRR")] to investors? Has that changed at all in the last -- I don't know, 12 or 24 months? And if so, what has it done?
>
> SCOTT PEDEN: *What's important to understand is that when we are pricing these policies, we're pricing all of them to a targeted IRR. And that has remained quite steady for some time.* That's one of the reasons that people are intrigued and very, very interested in life settlements is because we're able to get those to target like that. And so it's not as -- it's not market-sensitive, essentially.
>
> We have not seen those -- any kind of economic pressures collapsing those margins at all. We've been able to hold those. And in some respects, we've been able -- in some instances, we've been able to increase that target IRR. But again, that's because it is completely non-correlated to other kinds of financial markets, which makes it an excellent kind of alternative investment.
>
> *But no, I don't see those collapsing; certainly not in the foreseeable future.*
>
> *BRIAN PARDO: But we are being careful to be very fair with the sellers of the policies, because we don't want to end up on the left-hand page of the -- front page of the Wall Street Journal.*
>
> *SCOTT PEDEN: Well, and it's a competitive business. We always have to come out with a commercially competitive offer.*
>
> *BRIAN PARDO: Yes, but -- that's right. And so it's a matter of balancing fairness to everybody. And it's just a model that's developed over -- been developed, refined, further refined, further developed -- we're going on 19 years now.*

47.     The statements made by Defendants Pardo and Peden are false and misleading because the Company was engaging in unsustainable business practices, through inflation of the value of life settlements through the use of inaccurate life expectancy information.   The Defendants with the information available to them knew or recklessly disregarded the fact that the internal rate of return for investors had receded because of the Company's failure or resistance to adjust its methodology for calculating life expectancy.

48.     On September 16, 2009, LPHI issued a press release entitled "Life Partners Issues Preliminary Q2 Earnings."  Within the press release, Defendant Pardo stated, in pertinent part:

> *As recent news reports and these numbers show, we continue to see substantial growth in the life settlement industry and in Life Partners specifically. By concentrating on bringing value to all parties in our life settlement transactions, we ultimately bring value to our shareholders.* Our focus on bringing value is what made us the number one fastest-growing small public company in America according to Fortune Small Business magazine.

> [Emphasis Added]

49.     Defendant Pardo's statement was false and misleading because it fails to disclose that the Company was misrepresenting the value of the life settlements to the parties thereof and thus misrepresenting the strength of its operations to its shareholders.

50.     On December 17, 2009, LPHI issued a press release entitled, "Life Partners Predicts Record Earnings for Third Fiscal Quarter."  In the release, defendant Pardo is quoted as saying, "Life Partners has enjoyed continued growth in the life settlement industry because of our superior business model, our industry leadership and our commitment to providing service and value to our clients.  As the only publicly traded life settlement provider, our experience and transparency is important to individual accredited investors, institutional investors and lawmakers who want to know more about how our industry works."  However, LPHI was not

transparent and was only masquerading its business model as superior because of the Company's flawed valuations and misleading disclosures of underlying data.

51.     On January 18, 2010, the Company announced that its auditor, Eide Bailly LLP, resigned as the Company's independent registered public accounting firm effective January 13, 2010.

52.     On March 2, 2010, the Company announced that it engaged Ernst & Young as the firm's auditor.

53.     On March 26, 2010, LPHI issued a press release entitled, "Life Partners Predicts Increase in Earnings for Fiscal Year." The release stated in pertinent part that LPHI, "predicts an increase in earnings for its fiscal year ended February 28, 2010. The company expects to report a 9% increase in revenues and a 5% increase in net income for its 2010 fiscal year over the same period of the prior year. For the fiscal year, Life Partners expects to report revenues of $113 million compared to $104 million for its prior fiscal year. Net income for the current fiscal year will be $28.4 million, or $1.91 per share compared with net income of $27.2 million or $1.83 per split adjusted share during the previous fiscal year. While income from operations was up by 11%, earnings were affected by a non-recurring, non-operational charge in the fourth quarter resulting from a recognition of the decrease in market value of publicly traded securities acquired about five years ago for liquidity purposes, and the reclassification of those securities as other than temporarily impaired." The release also quotes Defendant Pardo as saying, "despite the impairment charge, this was still a record year for us and we expect to continue our trend of growth in revenues and earnings to continue during our next fiscal year."

54.     These statements were false and misleading when made as the Company lacked adequate internal and financial controls and its results were inflated by the usage of inaccurate underlying data.

55.     On May 12, 2010, the Company filed with the SEC on form 10-K its 2010 fiscal year report, certified pursuant to Sarbanes-Oxley by defendants Pardo and Martin as to the truthfulness and completing of the financial reports.   The 10-K was false and misleading as it failed to disclose that the Company's business practices were in fact unsustainable and that the Company's results and projections were all based on flawed and undisclosed data including that the Company routinely used unrealistic life expectancy data resulting in false promoted returns to investors.

56.     On September 22, 2010, LPHI issued a press release entitled, "Life Partners Issues Preliminary 2Q Earnings."   The release quotes defendant Pardo as stating, "despite an uncertain economy and a slowdown in the life settlement industry, our business has continued to increase with steady and sustainable growth. We expect this trend to continue throughout the remainder of our fiscal year."   This statement was false and misleading when made as the defendants knew that their business practices were in fact unsustainable and that the Company's results and projections were all based on flawed and undisclosed data.

57.     On October 27, 2010, the Company issued a press release entitled, "Life Settlements Continue to Gain Momentum as an Asset Class," which touted the Company and its operations.   The release failed to disclose that the Company's underlying methodologies were flawed and that its business practices were not sustainable.

58.     On December 21, 2010, *The Wall Street Journal* published an article entitled, "Odds Skew Against Investors in Bets on Strangers' Lives," that was critical of the Company

and its underlying methodologies.  The article reported that the Company, "made large fees from its life-insurance transactions while often significantly underestimating the life expectancies of people whose policies its customers invest in."   According to *The Wall Street Journal* investigation, "the result is that 10% or 15% yearly returns promoted to investors may prove elusive for many."

59.    The article, in great detail, explained the flawed methodologies and even quoted defendant Pardo as acknowledging "that many of Life Partners' life-expectancy estimates 'are probably wrong.'"

60.    In response, later in the day the Company issued a letter signed by defendant Pardo refuting the allegations of *The Wall Street Journal* article.  The letter stated, in pertinent part,

> Dear Investors,
>
> This morning, *The Wall Street Journal* ran an article that, in our view, provided a misleading depiction of some of our business practices and appeared to be based on anecdotal or incomplete information and the self-serving criticisms of some of our competitors. We would like to set the record straight.
>
> One of the focal points of this article was the system utilized by Life Partners to obtain estimates of life expectancies ("LE"). According to the article, a higher-than-expected number of insureds are exceeding the LEs on policies purchased through Life Partners Holdings, Inc.'s operating subsidiary, Life Partners, Inc. ("LPI"). However, as trade publications have reported, this phenomenon has been experienced *throughout the life settlement industry* and is not exclusive to LPI. The one factor in a life settlement transaction that can be controlled and adjusted is the discount at which the policy is acquired. Unlike other companies, LPI calculates sensitivity of return utilizing LE to set a reasonable premium escrow amount, and does not rely exclusively upon LE as the primary factor for profitability. LPI only purchases policies that are economically feasible, under both predicted circumstances as well as in the event the insured outlives their LE by a number of years.

LPI also provides its clients with analytical tools that can be applied to any policy being considered for purchase, so that the breakeven point can be determined. This refocuses the key element of profitability from LE accuracy to the discount to face amount. Few if any LPI clients are able to acquire interests in a large enough universe of policies to recreate statistical mortality tables. Therefore, statistical probabilities should not be considered to be the principal predictive factor with respect to potential returns. Instead, each life settlement transaction is structured with the goal of achieving the purchaser's target return and at a minimum, a positive return even if the insured outlives their LE prediction. In that way, the purchaser has the potential for superior returns, but also has a safety margin in the event that the LE for any or all policies is exceeded.

Further, as the article fails to note, the vast majority of purchasers acquire fractional interests in a number of policies, which provides them with risk diversification. While the LE for some of those policies may be exceeded, the purchaser may receive the proceeds on others significantly prior to their LE timeframe. It is the overall return on the funds that each purchaser dedicates to the purchase of policies that matters, not just the selected policies on which LE may have been exceeded.

*The Wall Street Journal* article also raises unwarranted issues regarding LPI's fee structure. During the past fiscal year, LPI's net income as a percentage of the face amount of policies that were the subject of life settlements arranged by LPI was approximately 11%. This amount is borne by the sellers of the policies as a discount to the price that they would otherwise receive if they were able to negotiate with a willing purchaser or group of purchasers directly. The discount at which LPI prices most policies allows for investors to achieve positive returns even when a policy is held for 12 years, including premium payments.

By purchasing policies at a significant discount to face value, LPI provides an opportunity for purchasers to both preserve principal and achieve a modest return, even if the LE is exceeded by five to seven years.

As always, we are continually reviewing our processes and operations with an eye toward providing even greater value to our investors and purchaser clients. We believe investors who are looking for long-term growth in an alternative asset class will continue to recognize the value that life settlement transactions bring to both the purchasers and the sellers of these policies.

Brian Pardo
CEO/Chairman of Life Partners Holdings, Inc.

61.     The letter by defendant Pardo was false and misleading when issued.   The
Company routinely used unrealistic life expectancy data resulting in false promoted returns to
investors and unsustainable business practices.

62.     On January 10, 2011, LPHI issued a press release entitled, "Life Partners Reports
Third Fiscal Quarter and Nine Months Results."  The release quoted defendant Pardo as stating,
"while revenues for this quarter were somewhat lower than expected, our balance sheet grew
stronger and investor interest in life settlements remains consistent."

63.     This statement was false and misleading when made as the Company's balance
sheet was premised on revenues derived from unsustainable business practices.

### THE TRUTH IS REVEALED

64.     On January 20, 2011, *The Wall Street Journal* reported that the Company was
being investigated by the SEC.   The article, entitled "SEC Probes Company Over Life-Span
Data," stated in pertinent part:

> The Securities and Exchange Commission is investigating Life
> Partners Holdings Inc., a Waco, Texas, company that has arranged
> for investors to buy several billion dollars of life-insurance policies
> from their original owners, according to four people who have
> been contacted recently by the agency.
>
> As part of its probe, the SEC's enforcement division has been
> seeking experts to analyze the way Life Partners has estimated the
> life expectancies of the insured individuals, these people say. The
> estimates—projections of how long the people might have to
> live—are a crucial part of the investment equation.
>
> The shorter an insured person's expected life span, the more Life
> Partners generally can charge for that policy, because investors
> expect a faster payout. If the death comes later than anticipated,
> not only is the policy payout delayed, but investors who buy
> policies or parts of them must continue to pay premium bills while
> they wait to collect on a death benefit.

Life Partners executives on Wednesday didn't respond to requests for comment.

Questions about the accuracy of Life Partners' life-expectancy estimates were the focus of a December Page One article in The Wall Street Journal. The article reported that many of the insured people are living well beyond the company's estimates, suggesting that the 10% or 15% yearly returns promoted to Life Partners' investor clients may prove elusive for many.

The company has said it remains confident in its methodology, and that even if many insured people outlive their projected life spans, investors likely will still make respectable single-digit annual returns.

Attractive projected returns for clients are a key part of Life Partners' formula for success. One of the fastest-growing small companies in the U.S. in recent years, Life Partners reported earnings of $29.4 million on $113 million of revenue for its fiscal year ended Feb. 28, 2010.

Life Partners says it has sold 6,400 policies with a face value of $2.8 billion to 27,000 clients since its 1991 founding. Life Partners extracts often-hefty fees in the deals, averaging $308,000 apiece for the 201 policies sold in its most recent fiscal year. Investors often buy pieces of multiple policies.

The company uses a Reno, Nev., physician, Donald T. Cassidy, to provide its life-expectancy estimates. Wednesday, Dr. Cassidy didn't respond to requests to his office for comment. He declined to be interviewed for the Journal's earlier story.

Rick Bergstrom, an actuary in Bellevue, Wash., who has worked in the life-settlements field since 1997, said an attorney from the SEC's Fort Worth, Texas, office called him last week, to ask whether he could help analyze Life Partners' life-expectancy projections.

Mr. Bergstrom said he and a partner five years ago examined Dr. Cassidy's work for an institutional investor that was thinking of hiring the physician.  They concluded Dr. Cassidy was using an "unrealistic" approach that tended to produce inaccurately short life expectancies, Mr. Bergstrom said.

Scott Gibson, an actuary at Lewis & Ellis Inc. in Richardson, Texas, said he recently received a similar call from an SEC attorney, adding that "nothing has come of it at this point."

An SEC spokesman said he couldn't confirm or deny the existence of any investigation into Life Partners.

In an interview with the Journal last week, an investor from St. Augustine, Fla., said he was personally assured in 2007 by Life Partners' chief executive, Brian Pardo, that the company's accuracy record on life-expectancy projections was "extremely high."

The investor, Charles A. Snell, a 71-year-old commercial real-estate developer, said in 2007 he invested $750,000 in Life Partners' fractional policies after traveling to Waco to meet with Mr. Pardo. Mr. Snell said he asked Mr. Pardo: "How accurate? Like 70 to 80%?" He said Mr. Pardo nodded and replied: "In that ballpark."

Of the six policies Mr. Snell invested in, most of the insureds were estimated to have five years or less to live. None have yet died, and he said he recently received a notice he will owe $20,000 in additional premiums by May. Mr. Snell, who hasn't yet earned any return on his investment, said he feels misled.

It isn't clear what action, if any, the SEC could take involving Life Partners. Although the company is publicly traded, it won a federal appeals court ruling 15 years ago that its life-settlement transactions weren't subject to federal securities laws.

Some states have claimed Life Partners' fractional-policy sales make it subject to state securities law. Life Partners in 2008 settled a fraud suit filed by Colorado regulators, agreeing to repurchase policies from many investors in that state. The settlement came with no finding of fraud.

Based on data Life Partners filed with the Texas Department of Insurance, the Journal found that, for policies sold from 2002 through 2005, insured people outlived Life Partners' projections about 90% of the time. Many of those policies were on HIV-positive people; Life Partners since 2004 mostly has sold policies on older people.

65.     The same day the Company issued a press release confirming the SEC investigation.  The stock dropped over $2.58 per share [17%] on this news from $14.99 to $12.41 on nearly five times average daily volume.  The stock continued to drop in the subsequent days and now trades at $8.55 per share.

66.     Therefore, the Plaintiff and the Class have suffered damages as a result of the Defendants' wrongful conduct.

## SCIENTER

67.     As alleged herein, Defendants acted with scienter in that Defendants, by and through their employee(s), knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of LPHI were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

## PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made false and misleading statements of material fact, and failed to disclose material facts, during the Class Period;

(b)     the misstatements and omissions were material;

(c)     the securities of the Company traded in efficient and open markets (excluding the effects of fraud), the Company was followed by analysts;

(d)     the Company's securities met the requirements for listing, and was listed and actively traded on the NASDAQ; and

(e)     the misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities.

69.     Plaintiff and members of the Class purchased their LPHI stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

70.     Based upon the foregoing, Plaintiff and other members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

## NO SAFE HARBOR

71.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LPHI who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Of The Securities And Exchange Commission against all Defendants

72.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

74.     During the Class Period, the Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase LPHI common stock during the Class Period at artificially inflated prices.

75.     During the Class Period, the Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

76.     As a result of the dissemination of the false and misleading statements set forth above, the market price of LPHI common stock was artificially inflated during the Class Period.

77.     Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing LPHI common stock.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

78.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

79.     By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of LPHI common stock during the Class Period.

### SECOND CLAIM
### For Violation Of Section 20(A) Of The Exchange Act
### (Against The Individual Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's expansion plans and implementation thereof, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Defendant Pardo is the beneficial owner of approximately 50% of the Company's common stock.

82.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against the Defendants for the damages sustained as a result of the wrongdoings of the Defendants, together with interest thereon;

C.     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, and experts;

D.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff has an effective remedy; and

E.     Granting such other and further relief as the Court may deem just and

proper.

Dated: February 14, 2011

THE LAW OFFICES OF ROD GOBLE
100 North 6th Street, Suite 800
P.O. Box 266
Waco, Texas 76703-0266
(254) 757-0070
FAX (254) 757-2033
By: _____ /S/_____
Rod Goble
State Bar No. 08046200

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
Gregory Mark Nespole
270 Madison Avenue
New York, New York 10016
Phone: 212.545.4600
Fax: 212.545.4653
**Nespole@whafh.com**

**Attorneys for Plaintiff**

/650239

Plaintiff's Certification of Investment of
Life Partners Holdings, Inc.

I, Joy Dittberner, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

I have reviewed the Complaint in this action and authorize the filing of this Certification.

If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary). I am willing to participate on an executive committee of shareholders.

Plaintiff's transaction in LPHI that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF STOCK | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 1,000 | 10/28/09 | $17.20 | common | 1,000 | 7/1/10 | $20.18 |
| 500 | 12/11/09 | $19.63 | common | 500 | 7/1/10 | $20.18 |
| 2,000 | 6/18/10 | $21.06 | common | 2,000 | 7/1/10 | $20.18 |
| 1,000 | 7/14/10 | $21.00 | common | 1,000 | 11/24/10 | $20.50 |
| 500 | 10/11/10 | $18.50 | common | 500 | 11/24/10 | $20.50 |
| 1,000 | 10/19/10 | $18.18 | common | 1,000 | 11/24/10 | $20.50 |
| 2,000 | 12/21/10 | $17.85 | common | 2,000 | 2/1/11 | $10.31 |
| 500 | 1/3/11 | split | common | 500 | 2/1/11 | $10.31 |

I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this 3rd day of February, 2011.

_____
Signature

Joy E. Dittberner

_____

Printed Name